[Cite as *State ex rel. Yost v. Crossridge, Inc.*, 2023-Ohio-4721.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

STATE OF OHIO EX REL. DAVE YOST, OHIO ATTORNEY GENERAL,

Plaintiff-Appellee,

v.

CROSSRIDGE, INC. ET AL.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 23 JE 0005

---

Civil Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 99CV00137

**BEFORE:**
David A. D'Apolito, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Dave Yost,* Ohio Attorney General, *Atty. Amy M. Geocaris, Atty. Amber Wootton-Hertlein, Atty. Emily E. Hudson* and *Atty. Matthew E. Meyer,* Assistant Attorneys General, Environmental Enforcement Section, for Plaintiff-Appellee and

*Atty. Steven A. Stickles*, for Defendants-Appellants.

Dated: December 14, 2023

**D'APOLITO, P.J.**

{¶1} Appellant, Joseph G. Scugoza, appeals the February 3, 2023 judgment of the Jefferson County Court of Common Pleas finding him in civil contempt for 20 violations of its previous orders, including October 8, 2003, October 15, 2012, August 5, 2014, and September 11, 2019.[1] On appeal, Appellant asserts the trial court erred in adopting Appellee's, State of Ohio, ex rel. Dave Yost, Ohio Attorney General, proposed purge terms because they were impossible for him to complete. Appellant also contends the court erred in ordering a $250 fine on each finding of contempt and ordering that each fine be levied consecutively for a total of $5,000. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶2} This court set forth the following facts and procedural history underlying this case in Appellant's first appeal, *State ex rel. Yost v. Crossridge, Inc.*, 2022-Ohio-1455, 188 N.E.3d 629 (7th Dist.):

> This matter has been litigated at length before the trial court and this Court since its inception in April of 1999. The facts up until this point are largely taken from our Opinion in *State ex rel. DeWine v. C&D Disposal Techs.*, 2016-Ohio-476, 58 N.E.3d 614 (7th Dist.) ("*C&D II*").

> Crossridge is a corporation that operated a landfill in Jefferson County. Joseph N. Scugoza, now deceased, was the principle shareholder of Crossridge. In April of 1999, the Ohio Environmental Protection Agency brought an enforcement action against Crossridge and Mr. Scugoza. In May of 2001, the estate of Joseph N. Scugoza was substituted as a party in place of Mr. Scugoza after a suggestion of death was filed. After Mr. Scugoza's death, his son, Appellee, took over as managing member and principle

---

[1] Crossridge, Inc. ("Crossridge") is also a named party. However, for purposes of this appeal, we will only refer to Scugoza as Appellant.

shareholder of Crossridge. Appellee was also the principle and sole shareholder of C&D.

In October of 2003, the parties reached a settlement and entered into a consent order and final judgment ("2003 consent order"). As part of the agreement, the estate of Joseph N. Scugoza was dismissed. In return, C&D consented to become a party defendant and to guarantee Crossridge's compliance with the order and the payment of the applicable civil penalties. The 2003 consent order resolved the environmental enforcement action and enjoined and ordered the parties to comply with its terms. Appellee signed the order as both executor of his father's estate and as the principle of C&D. In October of 2007, the parties entered into an extra-judicial agreement ("2007 extra-judicial agreement"), which partially amended the 2003 consent order. *C&D II* at ¶ 3-4.

In March of 2011, the state filed contempt charges against Crossridge, C&D, and Appellant as an individual for failure to comply with the 2003 consent order. The trial court dismissed the complaint due to the state's failure to reference the 2007 extra-judicial agreement. The state appealed the trial court's decision in *State ex rel. DeWine v. C&D Disposal Technologies*, 7th Dist. Jefferson No. 11 JE 19, 2012-Ohio-3005, 2012 WL 2522288, ("*C&D I*"). On appeal, we reversed the trial court's decision and held that the court abused its discretion in dismissing the contempt complaint without first holding a show cause hearing.

On remand, notice of a hearing was sent to all parties. Appellant's notice was sent to his attorney, who informed the court that he had withdrawn from representation of Appellant. However, he claimed that he had forwarded the notice to Appellant at his business address. Appellant failed to attend the hearing. The trial court entered judgment against Appellant (individually), Crossridge, and C&D, jointly and severally. In the court's 2012 contempt order, the defendants were ordered to provide financial assurances within

thirty days, comply with the final and post-closure plans, close the landfill within one year, begin post-closure care of the landfill, and pay the stipulated penalty of $19,316,000. Instead of directly appealing the trial court's order, Appellant filed a pro se Civ.R. 60(B)(1) motion on behalf of not only himself, but he also purported to represent Crossridge and C&D. The court denied the motion. Importantly, Appellant did not appeal the court's decision. *Id.* at ¶ 7.

Approximately one year later, Appellant filed a second and successive Civ.R.60 (B)(1) motion, this time through counsel. The trial court granted Appellant's second motion. In *C&D II,* we reversed the judgment of the trial court, holding that Appellant's remedy was to have filed a direct appeal, not a successive Civ.R. 60(B) motion. It does not appear that any attempt has been made to date to enforce the 2012 contempt finding.

Since that time, there have been several filings and hearings before the trial court. Relevant to this matter, on October 28, 2019, the state filed "Written Charges in Contempt, Motion to Show Cause & Request Hearing" against Appellant, Crossridge Inc., C&D Disposal Technologies, LLC, and the Estate of Joseph N. Scugoza.

The same charges were also filed against "new parties": Barbara Scugoza (wife of Joseph N. Scugoza, deceased), Delores Russell Scugoza (wife of Joseph G. Scugoza), Kevin Lisewski (day-to-day manager and operator of the site and manager of Phoenix Scrap Metals LLC), Phoenix Scrap Metals, LLC (owned by Delores Russell Scugoza), and Phoenix Off Road Park, LLC (owned by Delores Russell Scugoza). According to the state, although these new parties were not included in any previous court order, there is evidence that they acted in concert or participated in the violation of the court's orders.

The charges included: (1) failure to provide financial assurance for the Crossridge Landfill, (2) failure to complete closure of the Crossridge Landfill,

(3) failure to properly remove leachate from the Crossridge Landfill and open dump area and provide receipts, (4) failure to perform explosive gas monitoring at the Crossridge Landfill, (5) failure to perform groundwater monitoring of the Crossridge Landfill, (6) failure to begin post-closure care of the Crossridge Landfill, (7) failure to pay stipulated penalties, (8) failure to provide accounting for off-road events, (9) failure to cover the C&D Disposal Landfill, (10) failure to cover erosion rills on the C&D Disposal Landfill, (11) acceptance of additional waste, (12) failure to apply for NPDES permits, (13) failure to pay civil penalties, (14) failure to remove and dispose of solid waste and other materials at the open dump area and provide financial assurance for the C&D Disposal Landfill, (15) failure to close the C&D Disposal Landfill, (16) failure to perform post-closure care and provide financial assurance for the C&D Disposal Landfill, (17) failure to obtain a stormwater general permit, (18) failure to stabilize the disturbed area of the site, (19) failure to install and maintain proper stormwater controls, and (20) failure to provide written discovery.

Appellant and Crossridge filed an answer to the charges. Delores Russell-Scugoza, Phoenix Scrap Metals, LLC, and Phoenix Off Road Park, LLC filed a motion to dismiss the charges filed against them based on lack of personal jurisdiction. Barbara Scugoza filed a similar motion to dismiss. It does not appear that either of these motions have been resolved to date. It does not appear that Kevin Lisewski has ever filed an answer or motion to dismiss.

We note that this matter as it concerns defendant C&D Disposal is subject to a bankruptcy stay as of March 20, 2019. It does not appear that the stay has yet been lifted. The trial court determined that the stay did not apply to codefendant Crossridge. Regardless, this appeal involves only Appellant Joseph G. Scugoza, who has admitted to his contempt.

A hearing on the contempt charges was originally set for December 17, 2019, however, procedural issues within this case delayed the hearing. After this Court's remand on February 8, 2016, the parties continued to file motions and the trial court continued to rule on those motions and set hearing dates. However, on December 2, 2019, the trial court requested the assignment of a visiting judge. The Ohio Supreme Court appointed a visiting judge to preside over the case on December 30, 2019. The original trial court judge continued all hearings and held all motions in abeyance while the appointment was pending. Some motions continue to remain outstanding even after the appointment, however, these motions do not involve Appellant. The rulings have been delayed, at least in part, due to the fact that the visiting judge retired on February 1, 2020, just over a month after the appointment. On February 26, 2020, a second visiting judge, who is retired, was appointed to the case.

After the appointment of the second visiting judge, a hearing was held where Appellant admitted to his contempt. Then, on July 14, 2021, the trial court sentenced Appellant to a $250 fine and 10 days to be served at the Jefferson County Jail on each of the twenty counts to run consecutively, for an aggregate total of 200 days in jail, and a $5,000 fine. It is from this entry that Appellant timely appeals.

On July 19, 2021, we granted Appellant's motion for a stay of execution of sentence pending appeal. We specified that the stay applied only to the jail sentence.

After the notice of appeal was filed in this matter, the state filed several motions both to the trial court and in this Court. First, the state filed a motion in the trial court requesting a *nunc pro tunc* entry specifying that this matter involves civil contempt and requesting the inclusion of purge conditions. The trial court responded by filing a one-paragraph handwritten entry stating that this matter involves civil contempt and that Appellant "may purge the civil

contempt order upon a motion and hearing to this court and this judge. So ordered." (7/28/21 *Nunc Pro Tunc.*) The state filed a motion in this Court requesting that we enlarge the appellate record to include the *nunc pro tunc* entry. We overruled the motion, as the state had a procedure by rule, App.R. 3(C) (Cross appeal), available for this purpose. The state also filed a motion asking this Court to reconsider the issue of whether Appellant must pay a supersedeas bond. We overruled the motion.

On July 28, 2021, the state filed a motion seeking to supplement the appellate record with the missing portions of the transcripts Appellant originally had requested in the praecipe. However, this motion was improperly filed under the trial court caption and never became a part of the appellate record. As such, we were not given the opportunity to rule on the motion.

However, during our review of this case, it was readily apparent that Appellant's praecipe requested "Transcript of Day 1 of the hearing wherein the defendant Joseph G. Scugoza admitted to contempt and the transcript of the entirety of the proceedings on July 14, 2021." Despite this instruction, the court reporter prepared only a partial transcript of the July 14, 2021 hearing. Thus, we were not given any part of the "Day 1 hearing" or the remaining July 14, 2021 transcripts Appellant had requested. Accordingly, on January 11, 2022, we issued a judgment entry allowing the parties seven days to file the additional transcripts. On January 18, 2022, we received the full transcripts.

*Crossridge, supra*, at ¶ 2-16.

{¶3} In that appeal, Case No. 21 JE 0016, Appellant Joseph G. Scugoza, raised two assignments of error: (1) the trial court erred in failing to provide purge conditions; and (2) the court erred in ordering his jail term for each of the 20 violations to run consecutively. *Id.* at ¶ 17, 28. On March 28, 2022, this court "reversed and remanded for resentencing and for the purpose of imposing clear instructions as to conditions

Case No. 23 JE 0005

necessary for Appellant to purge his contempt." *Id.* at ¶ 50. This court did so, in part, because a lengthy jail sentence would only "further impair the already slow moving remediation efforts and perhaps halt these efforts all together during the jail term[.]" *Id.* at ¶ 47.

**{¶4}** Following remand, on October 4, 2022 and January 27, 2023, the trial court held hearings on the imposition of purge terms. Prior to the new hearings, the trial court indicated that a site visit was just completed. The record reveals that this "site" was the landfill itself.[2] The State submitted 28 exhibits and Appellant submitted one.

**{¶5}** The trial court heard evidence that as of October 3, 2022, the day before the hearing, there had been no compliance with the court's prior orders. (*Id.* at p. 27). It was revealed that Appellant had directed an associate to make physical modifications to the site immediately prior to the court's October 4, 2022 site visit to block a path used to access the top of the larger landfill. (*Id.* at p. 151-159). It was also revealed that Appellant had deliberately been unemployed and refused to generate income while this case is pending despite having no physical or mental impairments that would prevent him from working and generating funds to put towards site cleanup. (*Id.* at p. 245-248).

**{¶6}** Appellant argued in favor of what amounted to a 430-month "compliance plan." (*Id.* at p. 17, 19-20). Appellant proposed a plan in which he would haul just 100 tons of solid waste away from the open dump per month. (*Id.* at p. 17). The open dump contains three acres, or approximately 43,000 tons, of solid waste sitting exposed to the elements. (*Id.* at p. 53, 60). At a rate of 100 tons per month, it would take 35.83 years, or 430 months, to clear the site of openly dumped solid waste.

**{¶7}** Anderson testified regarding the lack of compliance to the previous orders requesting that Appellant safely close the site. (*Id.* at p. 25). Anderson stated the site should be closed and the approximate cost of the closure would total approximately 7.7 million dollars. (*Id.* at p. 29, 31). When asked if the $10,000 per month request from the State is reasonable to fund a financial assurance for the closure and post-closure care of the site, Anderson said that it is but that the Ohio EPA has yet to receive this ordered

---

[2] The State's witness, Sara Anderson ("Anderson"), an Environmental Specialist III with the Ohio EPA, was asked, "Now, we were just at the site an hour or so ago[?]" (10/4/2022 Hearing Tr., p. 24). Anderson stated, "Correct." (*Id.*)

amount from Appellant. (*Id.* at p. 33). Additionally, when asked if the 10,000 gallons of leachate per week removal is an appropriate term, Anderson agreed that it is. (*Id.*)

**{¶8}** Anderson further explained that the flow value controlling the leachate into the holding pond is currently being kept closed thereby preventing the waste water from being disposed of properly in the designated area. (*Id.*) Anderson revealed if it were to be opened now, the holding area would overflow without the removal of leachate due to Appellant's neglect. (*Id.* at p. 45). Anderson opined that the removal of 10,000 gallons per week is not nearly enough but taking into consideration Appellant's financial situation, it was something the Ohio EPA was comfortable with. (*Id.* at p. 49). Anderson explained that the removal is equal to just two tankers per week on any given day. (*Id.*)

**{¶9}** When asked further by the trial court if the mandate of the 10,000 gallons per week would prevent the holding areas from overflowing if we were to encounter another "hundred-year storm," Anderson stated that the 10,000 gallons per week was:

> [J]ust what we felt was a reasonable ask [sic] for this Court at this point. It is not what we would expect from, you know, a facility - - an owner/operator that's in compliance with our rules. We would expect that they dispose of as much leachate as - - as is generated per month, to ensure that there is less than a foot of head of leachate on the liner and that the leachate tank is not overflowing to the environment.
>
> So this is - - this is much less than we would expect a compliant landfill to do.

(*Id.* at p. 52).

**{¶10}** When asked about the proposed purge term, Anderson revealed the Ohio EPA has estimated that Appellant has illegally disposed of approximately 45,000 tons of waste on the three-acre open site without engineering controls, no leachate collection, or cap of any type. (*Id.* at p. 53). However, Anderson stated another company, IWS, along with Appellant, have removed approximately 2,000 tons of waste which leaves approximately 43,000 tons remaining. (*Id.*)

{¶11} The proposed purge term for the removal of this solid open waste is 750 tons per month which places the cleanup of this environmental hazard at five years. (*Id.* at p. 55-56). Anderson mentioned the environmental concern as there was no proper construction of the waste area at its inception which allows all leachate water to presumably flow into the ground water and presents a fire hazard. (*Id.* at p. 56). The fire hazard of open dumps is very difficult to extinguish and produces even more leachate since they have to be smothered with water. (*Id.* at p. 57). Additionally, there is no monitoring system on the open site to alert if dangerous levels of flammable gasses were building under the surface. (*Id.*) In order to prevent the additional formation of leachate waters on site, if a fire were to break out, Anderson said it would have to be smothered with soil, which Appellant has no means of providing or fighting the fire.[3] (*Id.*) Wintersville Fire Chief William Herrington testified that if Appellant's landfills caught fire, his department would have great difficulty even trucking water to the site in order to fight the fire. (*Id.* at p. 106-107).

{¶12} Appellant claimed he could only remove and dispose of 3,000 gallons of leachate per month from the site. (*Id.* at p. 238-244). Appellant also claimed he could install and monitor an explosive gas monitoring system. (*Id.*) Appellant claimed impossibility in purging his contempt due to a complete lack of financial resources. (*Id.* at p. 193, 196). Appellant admitted he has detailed, technical knowledge of what needs to be done and how to do it, and has knowledge of the closure process. (*Id.* at p. 217-219). Appellant admitted he has engineering plans, has accumulated proper fill material at the site to construct a landfill cap, and has detailed knowledge and understanding of the cost and process of hauling leachate. (*Id.* at p. 213, 218). Appellant also admitted he possesses a tanker trailer used for hauling leachate. (*Id.* at p. 208).

{¶13} Appellant testified there is nothing physically or mentally wrong with him which would prevent him from working and generating income to put towards cleaning up his derelict landfills and open dump. (*Id.* at p. 245). Appellant said he simply will not work while this case is pending, claiming that "trying to deal with this and the legal and everything else is kind of a full-time job" and "it's kind of a little tough to do that with everything that is going on with this in my life[.]" (*Id.* at p. 245, 248).

---

[3] This is presumably a known safety precaution at other compliant sites.

{¶14} It was revealed that Appellant has the ability to summon equipment and personnel to do work at the site. During the October 4, 2022 site visit, the trial court personally observed physical modifications Appellant had made to the C&D Landfill just a short time before. Appellant admitted that he had, just days earlier, directed Phoenix Scrap Metal employee Kevin Lisewski to use a Phoenix Scrap Metal loader to deposit large boulders on a path running up the side of the C&D Landfill. (*Id.* at p. 148-158). Appellant said that his wife owns Phoenix Scrap Metals. (*Id.* at p. 156). Appellant arrived at the site visit in a brand new Ford Bronco Diamond Edition which he claimed his wife's company had purchased. (*Id.* at p. 156, 168). Appellant admitted, however, that he primarily uses the vehicle for personal purposes. (*Id.* at p. 156).

{¶15} The trial court held a second hearing on January 27, 2023. The court heard oral arguments concerning the parties' respective positions regarding purge terms. Appellant once again submitted no evidence to support his claim of impossibility.

{¶16} On February 3, 2023, the trial court issued its judgment and order on contempt finding Appellant, "admitted liability to civil contempt, including all twenty charges" including;[4]

    a. In the first charge of contempt, failure to provide closure and post-closure care financial assurance for the Crossridge Landfill;

    b. In the second charge of contempt, failure to complete closure of the Crossridge Landfill;

    c. In the third charge of contempt, failure to properly remove leachate from the Crossridge Landfill and open dump area, and provide receipts;

    d. In the fourth charge of contempt, failure to perform explosive gas monitoring at the Crossridge Landfill;

    e. In the fifth charge of contempt, failure to perform groundwater monitoring at the Crossridge Landfill;

    f. In the sixth charge of contempt, failure to begin post-closure care of the Crossridge Landfill;

    g. In the seventh charge of contempt, failure to pay stipulated penalties;

---

[4] *See* (10/4/2022 New Sentencing and Purge Hearing Tr., p. 131).

h.  In the eighth charge of contempt, failure to provide accounting for off-road events;

i.  In the ninth charge of contempt, failure to cover the Construction and Demolition ("C&D") Disposal Landfill;

j.  In the tenth charge of contempt, failure to cover erosion rills on the C&D Disposal Landfill;

k.  In the eleventh charge of contempt, acceptance of additional waste;

l.  In the twelfth charge of contempt, failure to apply for any NPDES permits;

m.  In the thirteenth charge of contempt, failure to pay civil penalties;

n.  In the fourteenth charge of contempt, failure to remove and dispose of solid waste and other materials at the open dump area;

o.  In the fifteenth charge of contempt, failure to close the C&D Disposal Landfill;

p.  In the sixteenth charge of contempt, failure to perform post-closure care and provide financial assurance for the C&D Disposal Landfill;

q.  In the seventeenth charge of contempt, failure to obtain a storm-water general permit;

r.  In the eighteenth charge of contempt, failure to stabilize the disturbed areas of the Site;

s.  In the nineteenth charge of contempt, failure to install and maintain proper storm water controls; and,

t.  In the twentieth charge of contempt, failure to provide written discovery regarding financial institutions.

(2/3/2023 Judgment Entry and Order on Contempt, p. 2-3).

{¶17}  The trial court ordered the following:

1.  Defendant is ordered to serve thirty (30) days in the Jefferson County jail, which shall be held in abeyance pending compliance with the purge conditions set forth below;

2. Defendant is ordered to pay a fine in the amount of $250.00 per count, for a total fine in the amount of $5,000.00, not less than thirty (30) days after the effective date of this Order;

3. Defendant is ordered and enjoined to comply with all applicable provisions of R.C. Chapters 3714, 3734, and 6111 and all rules adopted under those chapters. Defendant shall ensure that activities conducted at the Site are conducted in compliance with this Order and with all terms and conditions of any permits and/or licenses issued for the Site; and,

4. Defendant shall comply with this Court's Orders dated October 8, 2003, October 15, 2012, August 5, 2014, and September 11, 2019 regarding injunctive relief at the Site.

(*Id.* at p. 3-4).

**{¶18}** The trial court ordered the following purge requirements:

5. Defendant may purge his contempt by complying with the following requirements at all times for the next six months:

 a. Not later than (30) days after the effective date of this Order, and by the first day of every month thereafter, Defendant shall pay $10,000 per month into a trust fund that satisfies the requirements set forth in Ohio Adm. Code 3745-27-17 and has been approved by Ohio EPA for the proper closure and post-closure care of the Crossridge Landfill.

 b. Defendant shall ensure that the Crossridge Landfill leachate management system is operated as designed, including but not limited to the following:

   i. Immediately open and keep open the valve from the leachate conveyance system to the leachate storage tank;

   ii. Not later than (30) days after the effective date of this Order, install a pump with a flow meter at the leachate storage tank that accurately records the volume of leachate removed from the storage tank;

Case No. 23 JE 0005

iii. Not later than (30) days after the effective date of this Order, install a high-level alarm with a telemetry system provided by a third-party that will provide real-time electronic notification to Defendant, Ohio EPA, and the Jefferson County General Health District if any of the following occur: leachate levels exceed 25,000 gallons in the storage tank, a power outage, or any system malfunction.

iv. Unless otherwise agreed upon in writing by Ohio EPA, Defendant shall ensure that these electronic notifications are delivered to email addresses provided by Ohio EPA and Jefferson County General Health District;

v. Utilize the pump and flow meter each time leachate is removed from the storage tank;

vi. Each and every calendar week, starting with the month after this Order becomes effective, Defendant shall remove and lawfully dispose of, at a minimum, 10,000[5] gallons of leachate from the storage tank and provide disposal receipts to Ohio EPA documenting removal and lawful disposal of the leachate by the 10th day of each subsequent month; and

vii. Defendant shall ensure the leachate storage tank contains no more than 25,000 gallons of leachate at any given time and, if leachate levels exceed this limit, Defendant shall immediately remove and lawfully dispose of leachate until leachate levels are below the limit.

c. Defendant shall maintain the volume data from the flow meter specified in 5.b.ii. for a minimum of three (3) years and shall make the data available to Ohio EPA and the Jefferson County General Health District upon request.

d. Each and every calendar month, starting the month after this Order becomes effective, Defendant shall remove and lawfully dispose of a

---

[5] Appellant agrees to haul at least three truck loads per week in a tanker that holds about 6,000 gallons, totaling approximately 18,000 gallons per week. (10/4/2022 Remanded Sentencing and Purge Hearing Tr., pg. 209, 241).

Case No. 23 JE 0005

minimum of seven hundred fifty (750)[6] tons of solid waste from the "Recycling Area" until all waste is removed and provide disposal receipts to Ohio EPA documenting removal and lawful disposal of the material by the 10th day of each subsequent month.

e. This Order shall be reviewed for compliance and renewed in six-month intervals by this Court to determine whether more solid waste and/or leachate shall be removed.

f. As this is civil contempt, Defendant is hereby granted 90 days from the date of this order to purge his contempt and the Court will hold a purge hearing on that day, to determine if Defendant is in full compliance with this Order.

g. At any time, the State may notify the Court of any violation of this Order, and the Court may set a purge hearing within two weeks of the date of the notice.

(*Id.* at p. 4-6).

{¶19} Appellant filed this appeal, Case No. 23 JE 0005, and raises two assignments of error.[7]

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED WHEN IT ADOPTED THE APPELLEE'S PROPOSED PURGE TERMS THEREBY ISSUING TERMS WHICH THE TRIAL COURT KNEW WERE IMPOSSIBLE FOR THE APPELLANT TO COMPLETE.**

{¶20} In his first assignment of error, Appellant argues the trial court abused its discretion in issuing purge terms that are impossible for him to fulfill.

---

[6] It will take approximately five years to complete this clean up. (*Id.* at p. 55). Appellant offers only 100 tons which would take approximately seven times longer to clean up an illegally opened open-dump site. (*Id.* at p. 240).

[7] This court granted Appellant's motion for stay.

Case No. 23 JE 0005

> A trial court abuses its discretion when it orders conditions for purging that are unreasonable or impossible for the contemnor to meet. *Pavlic v. Barium & Chemicals, Inc.,* 7th Dist. No. 02 JE 33, 2004-Ohio-1726, ¶ 71. The determination of whether a particular purge condition is unreasonable or impossible varies on a case-by-case basis. *Id.* The contemnor must present sufficient evidence at the contempt hearing that the trial court's purge conditions are unreasonable or impossible for the contemnor to meet. *Id.*

*Kirin v. Kirin*, 7th Dist. Mahoning No. 08 MA 243, 2011-Ohio-663, ¶ 28.

**{¶21}** An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

> The burden of proof for the moving party in a civil contempt action is clear and convincing evidence. *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 253, 416 N.E.2d 610. After the moving party establishes a prima facie case of contempt by showing evidence of nonpayment * * *, the burden shifts to the nonmoving party to establish a defense for nonpayment. *Morford v. Morford* (1993), 85 Ohio App.3d 50, 55, 619 N.E.2d 71.

> The nonmoving party must then prove any defense by a preponderance of the evidence. *Jeffers v. Jeffers,* 7th Dist. No. 07 BE 36, 2008-Ohio-3339, ¶ 15. "The preponderance of the evidence standard simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence." (Internal citations omitted.) *Crick v. Starr,* 7th Dist. No. 08MA173, 2009-Ohio-6754, ¶ 35.

*Kirin, supra,* at ¶ 21-22.

> Impossibility of performance is a valid affirmative defense to a contempt charge. *Gauthier v. Gauthier,* 12th Dist. Warren No. CA2011–05–048, 2012-Ohio-3046, 2012 WL 2524374, ¶ 33. Impossibility of performance

occurs when an unforeseen event arises that renders a party's performance of an obligation impossible. *Id.* The performance of the obligation must have been rendered impossible without any fault of the party asserting the defense. *Id.* A party who raises the defense of impossibility of performance has the burden of proving it.

*State ex rel. DeWine v. Washington C.H.*, 12th Dist. Fayette No. CA2013-12-030, 2014-Ohio-3557, ¶ 29.

{¶22} "A contemnor's '(u)nsubstantiated claims of financial difficulties do not establish an impossibility defense to a contempt charge.'" *State ex rel. Yost v. Anthony*, 4th Dist. Hocking No. 22CA2, 2022-Ohio-3188, ¶ 32, quoting *Wagshul v. Wagshul*, 2d Dist. Montgomery No. 23564, 2010-Ohio-3120, ¶ 41. A "'contemnor's unsupported claims of financial difficulty or an inability to pay are insufficient to establish that the trial court's conditions are unreasonable.'" *Anthony* at ¶ 32, quoting *In re I.L.J.,* 8th Dist. Cuyahoga No. 109564, 2020-Ohio-5434, ¶ 14.

{¶23} The State aptly summarizes this case as follows:

The major environmental problems at the Crossridge landfill, the C&D Disposal Technologies landfill and the open dump (collectively the "Crossridge Site") persist after 19 years of non-compliance from the first of multiple court orders requiring clean-up. Most urgently, dangerous leachate (wastewater) continues to pour from the Crossridge Site onto the ground and into the surface water of Jefferson County and the State of Ohio. Both landfills still lack a properly engineered cap, the Crossridge Landfill has no explosive gas monitoring, and the open dump's large mass of solid waste still sits exposed to the elements. The lack of properly engineered landfill caps aggravates the leachate problem and exposes the community to a continuing risk of disastrous landfill fires. These major environmental harms continue because the Crossridge Site's owner and operator, defendant-appellant Joseph G. Scugoza – who previously admitted to contempt on 20 *separate* counts – has largely ignored his obligations and refused to clean up his mess. * * *

Case No. 23 JE 0005

Evidence from the October 4, 2022 purge terms hearing offered no reason why Scugoza could not clean up his mess. Scugoza submitted no independent evidence of an inability to fulfill the purge terms, and his own testimony firmly established that Scugoza has tried to avoid his obligations through intentional unemployment. * * *

(Emphasis sic) (5/22/2023 Appellee's Brief, p. 2).

**{¶24}** The record establishes the trial court's purge terms are reasonable and within its inherent discretion. The purge terms, if complied with, would purge Appellant's contempt charges as well as make significant progress in cleaning up the Crossridge Site. There is approximately 43,000 tons of solid waste (garbage) on the site. The court's imposed purge terms require the removal and lawful disposal of 750 tons of solid waste per month. Thus, the court provided Appellant with more than 57 months, nearly five additional years, to clean up this portion of his mess, which was previously ordered years ago. As such, the court's purge terms, which balance the public's interest regarding the widespread environmental violations, are reasonable.

**{¶25}** In fact, it is Appellant's proposed terms that are unreasonable. Appellant proposed a plan in which he would remove solid waste at a rate of only 100 tons per month, which would take him 430 months, or nearly 36 years, to complete the clean-up. Appellant acknowledges that his plan may have no practical completion date, suggesting that the clean-up efforts would continue "in perpetuity." (5/1/2023 Appellant's Brief, p. 5).

**{¶26}** The record also establishes Appellant failed to meet his burden to present independent evidence to overcome the presumption in favor of an ability to comply. During the hearings, Appellant did not present any independent evidence, and no actual financial records, showing a reduced ability or an inability to comply with the trial court's orders. Appellant merely claims he lacks the necessary equipment or money to fix the problems at his landfills and open dump. However, Appellant's unsupported, self-serving statements are insufficient to meet his burden to establish evidence of an inability to pay. *See Anthony, supra.*

**{¶27}** As stated, Appellant showed up at the site visit in a brand new Ford Bronco Diamond Edition and admitted that he primarily uses the vehicle for his personal

purposes. Appellant also admitted that he can use his wife's company's equipment and personnel at the Crossridge Site when he wants to. Appellant admitted he has detailed, technical knowledge of what needs to be done and how to do it, and has knowledge of the closure process. Appellant admitted he has engineering plans, has accumulated proper fill material at the site to construct a landfill cap, and has detailed knowledge and understanding of the cost and process of hauling leachate. Appellant also admitted he possesses a tanker trailer used for hauling leachate.

{¶28} Appellant's admitted, intentional unemployment does not support a finding of impossibility. Again, Appellant testified there is nothing physically or mentally wrong with him which would prevent him from working and generating income to put towards cleaning up his derelict landfills and open dump. Appellant said he simply will not work while this case is pending, claiming that "trying to deal with this and the legal and everything else is kind of a full-time job" and "it's kind of a little tough to do that with everything that is going on with this in my life[.]" (10/4/2022 Hearing Tr., p. 245, 248). Appellant's refusal to work has created his inability to fulfill his court ordered environmental obligations. Also, Appellant's 430-month (over 35 years) "compliance plan" is clearly unreasonable.

{¶29} The trial court did not abuse its discretion in setting the purge terms and rejecting Appellant's unsupported claims of an inability to pay. Appellant has made no efforts to comply whatsoever and failed to offer any independent evidence or financial records to meet his burden to show that purging his contempt was unreasonable or impossible. Thus, Appellant cannot demonstrate the court's purge terms are unreasonable, arbitrary, or unconscionable.

{¶30} Appellant's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED WHEN IT ORDERED A $250.00 FINE ON EACH COUNT OF CIVIL CONTEMPT AND ORDERED THAT EACH FINE BE LEVIED CONSECUTIVELY TO ONE ANOTHER, THEREBY CREATING A TOTAL NET FINE OF $5,000.00 EVEN THOUGH**

**IMPOSING CIVIL CONTEMPT SANCTIONS CONSECUTIVELY TO ONE ANOTHER IS CONTRARY TO LAW.**

{¶31} In his second assignment of error, Appellant contends the trial court abused its discretion in ordering the fines to run consecutively for a total of $5,000. Instead, Appellant claims the court could only impose a single $250 fine for a single count of contempt.

{¶32} R.C. 2705.05 states in part:

(A) In all contempt proceedings, the court shall conduct a hearing. At the hearing, the court shall investigate the charge and hear any answer or testimony that the accused makes or offers and shall determine whether the accused is guilty of the contempt charge. If the accused is found guilty, the court may impose any of the following penalties:

(1) For a first offense, a fine of not more than two hundred fifty dollars, a definite term of imprisonment of not more than thirty days in jail, or both[.]

R.C. 2705.05(A)(1).

{¶33} "[T]he [Ohio Supreme] Court made it clear that the legislature cannot limit a court's inherent power to punish contempt." *Crossridge, supra*, at ¶ 38, citing *State ex rel. Johnson v. Cty. Court of Perry Cty.,* 25 Ohio St.3d 53 (1986). "That said, it is also clear that R.C. 2705.05(A) is to be considered as a guideline for the court when punishing a contemptor." *Crossridge* at ¶ 38; *see also Cincinnati v. Cincinnati Dist. Council 51*, 35 Ohio St.2d 197, 207 (1973) ("the power to punish for contempt has traditionally been regarded as inherent in the courts and not subject to legislative control"); *State ex rel. Anderson v. Industrial Com'n.*, 9 Ohio St.3d 170, 172 (1984) (courts have "wide discretion to determine the punishment for contempt of [their] own orders.")

{¶34} Appellant admitted to 20 separate counts of civil contempt spanning decades of noncompliance with numerous court orders. The trial court acted within its discretion in imposing consecutive fines for the 20 counts of admitted contempt proportionate to the environmental significance of Appellant's noncompliance. The court imposed a $250 fine for each of the 20 instances of Appellant's admitted contempt, for a

total fine of $5,000, within the R.C. 2705.05(A)(1) statutory framework. The court did not abuse its discretion in imposing a cumulative $5,000 fine for Appellant's 20 counts of contempt as the size of the fine is not disproportionate to the magnitude and continuing nature of his noncompliance and defiance. *See, e.g., Citicasters Co. v. Stop 26-Riverbend, Inc.*, 147 Ohio App.3d 531, 2002-Ohio-2286 (7th Dist.).

{¶35} Appellant's second assignment of error is without merit.

## CONCLUSION

{¶36} For the foregoing reasons, Appellant's assignments of error are not well-taken. The February 3, 2023 judgment of the Jefferson County Court of Common Pleas is affirmed.


Waite, J., concurs.

Hanni, J., concurs.

[Cite as *State ex rel. Yost v. Crossridge, Inc.*, 2023-Ohio-4721.]

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**